UNITED STATES DISTRICT COURT      <u>FOR ONLINE PUBLICATION ONLY</u>
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------- X

MACHEL LIVERPOOL,

                *Plaintiff*,

                              MEMORANDUM
                              <u>AND ORDER</u>

      - against -

CON-WAY, INC., CON-WAY CENTRAL              08-CV-4076 (JG) (JO)
EXPRESS, and CON-WAY FREIGHT,

                       *Defendants*.
------------------------------------------------------------- X

A P P E A R A N C E S :

        DEBORAH H. KARPATKIN
             99 Park Avenue, Suite 1600
             New York, NY 10016
             *Attorney for Plaintiff*

        NOWELL AMOROSO KLEIN BIERMAN, P.A.
             140 Broadway
             New York, NY 10005
        By:   Bradley M. Wilson
             Lori E. Kolin
             *Attorneys for Defendants*

JOHN GLEESON, United States District Judge:

        Machel Liverpool brings this diversity action under 42 U.S.C. § 1983, alleging

that defendants violated state tort and labor law by making false and damaging statements

regarding a drug test Liverpool took while working as a truck driver for Con-Way Central

Express. Defendants move to dismiss, alleging that Liverpool has failed to establish personal

jurisdiction over Con-Way, Inc., that his claims are barred by a contractual limitations provision,

and that he has failed to state a claim under any theory of liability. For the following reasons, the

motion to dismiss for lack of jurisdiction is denied and the motion to dismiss for failure to state a

claim is granted with respect to Liverpool's sixth cause of action and denied in all other respects.

BACKGROUND

Liverpool's complaint was filed on October 6, 2008, and amended on December

5, 2008. The following facts are drawn from the plaintiffs' amended complaint and are assumed

to be true for the purposes of this motion.

On March 19, 2004, Liverpool was hired by Con-Way Central Express as a

warehouse worker.[1] He began work as a truck driver several months later. As a truck driver, he

was subject to random drug tests pursuant to company and Department of Transportation

("DOT") policy. When Liverpool was directed to take a drug test, he would "punch out of

work" and report to the testing site. Amended Compl. ¶ 17. He would not return to work

following the test. Liverpool followed the instructions he received from his employer regarding

the tests and never received any indication that his practice of punching out and not returning to

work for the remainder of the day was improper.

On January 8, 2007, at some time before 8:00 A.M., Liverpool arrived at work.

He was told to report for a drug test and punched out. Knowing that the testing site did not open

until 9:00 or 9:30 A.M., and that he therefore "had some time until the testing site opened,"

Liverpool "went in his car to meet a young woman of his acquaintance and to spend intimate

time with her." *Id.* at ¶¶ 25-26. He arrived at the testing site "sometime around 10:00 AM or

10:30 AM and was administered the drug test." *Id.* at ¶ 27. He did not return to work on

_____

[1]    Liverpool's complaint states that he was "hired by CON-WAY CENTRAL EXPRESS . . . a
subsidiary and regional company of defendant CON-WAY, INC.," and that "[d]efendant CON-WAY FREIGHT . . .
is the successor entity to defendant CON-WAY CENTRAL EXPRESS.") Amended Compl. ¶ 7. However,
throughout the remainder of his complaint, he refers only to actions taken by "CON-WAY." His complaint also
states that "[d]efendants are collectively referred to here as 'CON-WAY.'" *Id.* Accordingly, this section of this
memorandum and order uses "Con-Way" to refer to all defendants collectively.

January 8, but "worked as usual" from January 9 to January 11. *Id.* at ¶ 29. On January 11, 2007, Liverpool's local human resources manager was informed that the result of the drug test was "negative, dilute." *Id.* at ¶ 30. Liverpool had received the same result, "without adverse comment or adverse employment consequences," from at least one other test he had taken during his employment. *Id.* at ¶ 31.

On January 15, 2007, when Liverpool reported for work, he was directed to his Terminal Manager. This manager asked him where he went before reporting for the January 8 drug test and why he did not return to work after the test. Liverpool stated that he went to a Wendy's restaurant for breakfast before the test. Liverpool was subsequently informed that Con-Way had discovered that Wendy's did not serve breakfast, and that Liverpool was being terminated "because of overall poor attendance and dishonesty." *Id.* at ¶ 35.

After his discharge, Liverpool applied for unemployment benefits. His former employer opposed his claim, alleging that he "'was discharged for excessive absenteeism.'" *Id.* at ¶ 38. On February 21, 2007, the Department of Labor ("DOL") approved Liverpool's claim. Con-Way's appeal was denied on April 16, 2007.

In February 2007, Liverpool applied for and accepted a job as a truck driver for JB Hunt. Due to a "family medical emergency," he left this job after one day. *Id.* at ¶ 46. He resumed his search for employment as a truck driver in the fall of 2007 and applied for a job with Bavarian Motor Transport ("BMT"). Liverpool was not offered a job, even though a position that matched his qualifications was available. He subsequently learned that BMT had received a "'Drug/Alcohol Disclosure'" from USIS, a database that collects work history information in the trucking industry. *Id.* at ¶ 50. He also learned that Con-Way had told a BMT representative that Liverpool had failed a drug test.

Liverpool also re-applied for a job with JB Hunt. JB Hunt's investigator was told by Con-Way that Liverpool "did not pass a drug test with them." *Id.* at ¶ 54. Liverpool offered to rebut this claim, but was told that JB Hunt could not hire him.

On November 5, 2007, Liverpool began working for Central Transport, Inc. as a truck driver. One week later, he was told that "a hold had been put on his employment." *Id.* at ¶ 60. Central Transport terminated Liverpool's employment a few days later. Liverpool requested an explanation, and received a copy of a report Con-Way had sent to Central Transport stating that he "'had refused a random, post-accident or reasonable suspicion test on January 8, 2007.'" *Id.* at ¶ 61. Central Transport also reported to the USIS database that it had terminated Liverpool because of this report. Accordingly, this information is available to any prospective employer in the industry.

Liverpool's December 5, 2008 amended complaint alleges that Con-Way's statements regarding the January 8 drug test were defamatory, that Con-Way made these statements in retaliation for Liverpool's application for unemployment benefits, and that Con-Way's actions render it liable to Liverpool under a theory of prima facie tort. On February 6, 2009, the defendants filed a motion to dismiss, arguing that the Court does not have jurisdiction over Con-Way, Inc. and that Liverpool's complaint fails to state a claim against any of the defendants. I heard oral argument on the motion on April 17, 2009.

## DISCUSSION

A.    *Personal Jurisdiction over Con-Way, Inc.*

1.    *Jurisdiction over Foreign Corporations in New York State*

In this district, service of process establishes personal jurisdiction over a defendant who is subject to the jurisdiction of the New York State Supreme Court. *See* Fed. R.

Civ. P. 4(k)(1)(A).  Properly construed, Liverpool's attempt to establish jurisdiction over Con-Way, Inc. implicates three distinct theories of personal jurisdiction, two arising under N.Y. C.P.L.R. § 301 and one arising under C.P.L.R. § 302.  A brief discussion of each theory will aid in assessing the parties' jurisdictional claims.

a.  *Corporations "Doing Business" in New York and N.Y. C.P.L.R. § 301*

Prior to the enactment of New York's "long arm" jurisdictional statute, "a foreign corporation, not authorized to do business in this State, was held amenable to local suit only if it was engaged in such a continuous and systematic course of 'doing business' here as to warrant a finding of its 'presence' in this jurisdiction." *Simonson v. Int'l Bank*, 14 N.Y.2d 281, 285 (1964).  This theory of personal jurisdiction was apparently first announced in New York in the 1917 decision *Tauza v. Susquehanna Coal Co.*, 220 N.Y. 259 (1917) (Cardozo, J.), and is based on the proposition that an entity's in-state presence vests the state's courts with jurisdiction over it.  *See Tauza*, 220 N.Y. at 268 ("All that is requisite is that enough be done to enable us to say that the corporation *is here*.") (emphasis added).

In 1945, the United States Supreme Court rejected the proposition that the Due Process Clause required such presence as a prerequisite to personal jurisdiction.  *Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. and Placement*, 326 U.S. 310, 316 (1945). While the Supreme Court's evolving due process jurisprudence "broadly expanded the power of this State to subject foreign corporations and nonresident individuals, not 'present' in the forum, to the personal jurisdiction of its courts, the Legislature took no steps to exercise that power until the enactment of the CPLR." *Simonson*, 14 N.Y.2d at 286.  Furthermore, while the new jurisdictional statutes contained provisions, such as C.P.L.R. § 302, "enlarging the bases for acquiring personal jurisdiction over foreign corporations and nonresident persons," *Simonson*, 14

N.Y.2d at 284, they also contained provisions preserving older theories of jurisdiction. Specifically, § 301 provides that "[a] court may exercise such jurisdiction over persons, property, or status as might have been exercised heretofore." Accordingly, the Court of Appeals, citing § 301, has continued to develop and apply the principle that a foreign defendant may subject itself to personal jurisdiction in New York by "doing business" here. S*ee Delagi v. Volkswagenwerk AG*, 29 N.Y.2d 426, 430 (1972).

Cases following *Tauza* also establish that a corporation may be deemed present through the conduct of an affiliate or a subsidiary. In *Taca International Airlines, S.A. v. Rolls-Royce of England, Ltd.*, 15 N.Y.2d 97, 99 (1965), the Court of Appeals considered the jurisdictional implications of the relationship between Rolls-Royce of England, Ltd. ("Rolls-Royce Ltd."), a British corporation that itself conducted no business in New York, and Rolls-Royce Inc., a "separately incorporated" entity that was indisputably doing business in New York. The Court opined that the dispositive question was whether, factually, Rolls-Royce Inc. was "a really independent entity" or "a mere department" of Rolls-Royce Ltd. *Id.* at 102. After cataloguing the numerous ways in which Rolls-Royce Ltd. exercised control over Rolls-Royce Inc., the court held that Ltd. "was doing extensive business in our State through its local department separately incorporated as [Rolls-Royce] Inc.," and was therefore amenable to personal jurisdiction. *Id.* In *Volkswagenwerk AG v. Beech Aircraft Corp.*, 751 F.2d 117, 120-22 (2d Cir. 1984), the Second Circuit synthesized the line of cases interpreting *Taca*'s "mere department" language and established four factors to be weighed in determining whether a separate corporate entity is merely a department of another for jurisdictional purposes: "common ownership;" "financial dependency of the subsidiary on the parent;" "the degree to which the parent corporation interferes in the selection and assignment of the subsidiary's executive

personnel and fails to observe corporate formalities;" and "the degree of control over the marketing and operational policies of the subsidiary exercised by the parent."

       *Frummer v. Hilton Hotels International, Inc.*, 19 N.Y.2d 533 (1967), announced a related theory of vicarious personal jurisdiction.  In that case, the plaintiff was injured in a Hilton Hotel in London.  He sued Hilton Hotels (U.K.) Ltd. ("HHUK"), a British corporation that operated the hotel in question, and Hilton Hotels Corp. and Hilton Hotels International, "both of which are Delaware corporations doing business in New York."  *Id.* at 535.  In determining whether HHUK was doing business in New York, the Court first examined the case of *Bryant v. Finnish National Airline*, 15 N.Y.2d 426 (1965), where it found that a corporation was "doing business" in New York when it "has a lease on a New York office, . . . employs several people and . . . has a bank account here, . . . does public relations and publicity work for defendant here including maintaining contacts with other airlines and travel agencies [,]. . . transmits requests for space to defendant in Europe and helps to generate business."  *Id.* at 537 (quoting *Bryant*, 15 N.Y.2d at 432 (omissions in *Frummer*)).  The Court then observed that, "[i]n the case before us, these same services are provided for the defendant [HHUK] by the Hilton Reservation Service . . . ."  *Id.*  After detailing the similarities between the Reservation Service and the airline in *Bryant*, the majority opinion summarized: "[i]n short -- and this is the significant and pivotal factor -- the Service does all the business which [HHUK] could do were it here by its own officials."  *Id.*  It therefore concluded that HHUK "was 'doing business' here in the *traditional* sense."  *Id.* at 536.

       The majority opinion then distinguished *Miller v. Surf Properties, Inc.*, 4 N.Y.2d 475 (1958), in which it "held that the activities of a 'travel agency' were not sufficient to give our courts in personam jurisdiction over a Florida hotel when the agency's services 'amounted to little more than rendering telephone service and mailing brochures' for the hotel and 30 other

independent and unassociated Florida establishments." *Frummer*, 19 N.Y.2d at 537-38 (quoting *Miller*, 4 N.Y.2d at 481). *Bryant* had distinguished *Miller* because the in-state activities in *Miller* were not carried out by an employee but by "an independent travel agency representing defendant in New York City." *Id.* at 538 (quoting *Bryant*, 15 N.Y.2d at 431). This distinction did not help HHUK, however, because even though the Reservation Service was not technically HHUK's "employee . . . , the Service and [HHUK] are owned in common by the other defendants and the Service is concededly run on a 'non-profit' basis for the benefit of the London Hilton and other Hilton hotels." *Frummer*, 19 N.Y.2d at 538.

The *Frummer* opinion expressly states that it is concerned with jurisdiction over a foreign corporation, rather than a parent company's liability for the acts of a subsidiary. It holds that "the 'presence' of [HHUK] in New York, for purposes of jurisdiction, is established by the activities conducted here on its behalf by its agent, the Hilton Reservation Service, and the fact that the two are commonly owned is significant only because it gives rise to a valid inference as to the broad scope of the agency in the absence of an express agency agreement . . . ." *Id.* While mindful of the burdens of "litigation in a foreign jurisdiction," the Court concluded that, when the activities of a foreign corporation, "either directly or through an agent, become as widespread and energetic as the activities in New York conducted by [HHUK through the Reservation Service], they receive considerable benefits from such foreign business and may not be heard to complain about the burdens." *Id*.

*Frummer* thus establishes that a corporation will be deemed to be doing business in New York when a "valid inference of agency" arises between that corporation and another entity that actually engages in in-state business activity. *Delagi*, 29 N.Y.2d at 431. Although "a line cannot be simply drawn" between these two principles, *Bulova Watch Co., Inc. v. K. Hattori*

& *Co., Ltd.*, 508 F. Supp. 1322, 1344 (E.D.N.Y. 1981) (Weinstein, J.), both the Court of

Appeals, *see Delagi*, 29 N.Y.2d at 431-32, and the Second Circuit, *Jazini v. Nissan Motor Co.,*

*Ltd.*, 148 F.3d 181, 184 (2d Cir. 1998), treat the "agency" test of *Frummer* and the "mere

department" test of *Taca* as two distinct theories of jurisdiction.  And both tests, as formulated by

the Court of Appeals, seek to determine whether a corporation is "doing business" in New York,

a principle of jurisdiction that predates the enactment of the long-arm statute and is currently

preserved by C.P.L.R. § 301.  *See Frummer*, 19 N.Y.2d at 535-36 (eschewing § 302 and

embracing § 301 as the relevant source of personal jurisdiction).

       b.     *Transacting Business Under N.Y.C.P.L.R. § 302*

New York's long-arm statute took effect on September 1, 1963.  *Simonson*, 14

N.Y.2d at 284.  It provides, in relevant part, that "[a]s to a cause of action *arising from any of the*

*acts enumerated in this section*, a court may exercise personal jurisdiction over any non-

domiciliary . . . who in person or *through an agent . . . transacts any business* within the state . . .

."  N.Y. C.P.L.R. § 302(a)(1) (emphasis added).  The emphasized portions of this statute

illuminate two distinctions from and an apparent continuity with the "doing business" theory

discussed above.  First, § 302 is implicated by "transact[ing]" business, rather than by "doing"

business.  This language has been held to require less pervasive contact with the forum state:

"[d]oing business is to transacting business what a full length mink coat is to tennis shorts."

*Bulova*, 508 F. Supp. at 1345.  However, the "arising under" language of this provision also

requires a nexus between the transactions that establish jurisdiction and the subject matter of the

suit.  Conversely, if a corporation is actually "doing business" in New York, it may be sued there

even for liability arising elsewhere.  *See Taca*, 15 N.Y.2d at 99-100 (finding personal jurisdiction

under § 301 for negligence taking place in Nicaragua).

The long-arm statute also establishes that jurisdiction lies when a corporation transacts business "through an agent." N.Y.C.P.L. § 302(a)(1). Therefore, a foreign corporation may be amenable to jurisdiction under § 302(a)(1), as under § 301, based on the actions of a third party. The Court of Appeals addressed this agency language in *Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460 (1988). In deciding whether a corporate defendant "was acting as the agent" of other corporate and individual defendants under § 302(a)(1), "the provision in issue on this appeal," the Court held that it was not necessary to "establish a formal agency relationship." *Id.* at 467. Instead, a plaintiff "need only convince the court that [the in-state defendant] engaged in purposeful activities in this State in relation to [the transaction giving rise to the lawsuit] for the benefit of and with the knowledge and consent of [the foreign defendants] and that they exercised some control over [the in-state defendant] *in the matter*." *Id.* (emphasis added). The Court of Appeals has not yet addressed whether or how this inquiry differs from the "agency" test of *Frummer* or the "mere department" test of *Taca*. While the emphasized language suggests that this inquiry focuses on the transactions challenged in the complaint, rather than the entirety of the in-state business conducted by the alleged agent, I find that I need not address this issue in order to properly exercise jurisdiction over Con-Way, Inc.

2.    *The Parties' Jurisdictional Arguments*

The parties do not dispute the Court's jurisdiction over Con-Way Central Express ("CCX"), the entity that "hired" Liverpool, Amended Compl. ¶ 7, and Con-Way Freight ("Freight"), its successor in interest. *Id.* Defendants argue, however, that the activities of these subsidiaries do not give rise to jurisdiction over their parent, Con-Way, Inc. To prove otherwise, they argue, Liverpool must show that the parent's control over the subsidiary is "so

complete that the subsidiary is, in fact, merely a department of the parent." Def. Mem. 5-6

(citing *Porter v. LSB Indus., Inc.*, 192 A.D.2d 205, 213 (4th Dep't 1993)).

Although this is an accurate reading of *Porter*, that case erroneously conflates the three distinct threads of New York personal jurisdiction jurisprudence discussed above, and is accordingly of limited use in determining whether I have jurisdiction over Con-Way, Inc. The relevant portion of *Porter* purports to interpret the "through an agent" language of § 302(a)(1). *Porter*, 192 A.D.2d at 212. However, the cases it cites in its analysis -- *Frummer*, *Taca*, and *Beech Aircraft* -- do not involve interpretations of § 302. As discussed above, those cases analyze whether a corporate defendant is "doing business" under *Tauza* and its progeny. That is, they discuss whether jurisdiction lies under § 301. Furthermore, they announce and interpret two distinct theories of "vicarious" jurisdiction under that section: the "agency" theory of *Frummer* and the "mere department" theory of *Taca*. As discussed above, the Court of Appeals' most recent pronouncement on the "through an agent" language of § 302(a)(1) is *Kreutter v. McFadden Oil Corp.* Although the *Porter* opinion cites *Kreutter* preliminarily, it does not discuss whether or how *Kreutter*'s agency test differs from those announced by *Frummer* and *Taca*. And while it purports to apply both *Taca* and *Frummer*, its factoral analysis clearly applies only to the "mere department" theory of the former case, and does not address the "agency" theory announced by the latter case.

Plaintiff's response does not address the "mere department" theory. Instead, it argues that jurisdiction is proper under the agency theory of *Jazini*, and, by implication, *Frummer*. Put another way, it argues that CCX "does all the business which [Con-Way, Inc.] could do were it here by its own officials." Although plaintiff chiefly relies on *Uebler v. Boss Media AB*, 432 F. Supp. 2d 301 (E.D.N.Y. 2006), a case that, like *Porter*, conflates and confuses

various jurisdictional theories,[2] I am ultimately persuaded that Liverpool has established jurisdiction under *Frummer*.

3. *Con-Way Inc. "Does Business" in New York Under* Frummer *and § 301*

Liverpool's complaint states that CCX/Freight maintains a warehouse in New York, that it hires and trains employees there, and provides shipping services to the New York area. I find that these activities constitute "doing business" in New York under *Tauza*. I also conclude that furnishing information about a former employee constitutes "transacting business" under § 302(a)(1). The defendants do not dispute the sufficiency of CCX/Freight's contacts with New York. The question is whether Con-Way, Inc. is amenable to jurisdiction based on these activities.

Liverpool's amended complaint alleges that CCX "was a subsidiary and regional company of defendant Con-Way, Inc," and that "Con-way Inc. operates in New York through Con-Way Freight," and "states on its website . . . that [Freight] is one of its 'primary operating companies.'" Amended Compl. ¶ 7. This website "which is also the website for [Freight], sets forth its extensive operations through [Freight] for [LTL] shipping services to all points served in the United States," and "states [Con-Way, Inc.'s] view of itself as 'an integrated, single-source business model, one that better prepares Con-Way -- and its customers -- to meet the test of global competition.'" *Id.* The complaint also states that "[d]uring the course of his employment as a truck driver with Con-Way, Liverpool worked with bills of lading containing a reference to www.con-way.com. This is the website of defendant Con-Way, Inc. The Con-Way, Inc. website is used to access services and information about trucking shipments with Con-Way Freight." *Id.* at ¶ 21. Finally, the complaint alleges that "[d]uring the course of his employment . . . Liverpool was issued various documents pertaining to his employment with the reference

[2]      Specifically, *Uebler* relies on § 301 cases (*Frummer*, *Jazini*, and *Bulova*) to interpret § 302.

'Con-Way.'  These documents did not specify whether the reference was to Con-Way, Inc., or Con-Way Freight or Con-Way Express."  *Id.* at ¶ 22.

I conclude that these representations satisfy the less-than-stringent test for agency under *Frummer*.  Con-Way, Inc.'s website states that Freight is "one of its primary operating companies."  *Id.* at ¶ 7.  It is reasonable to infer from this representation that Con-Way, Inc. has sole or controlling ownership of Freight.  Con-Way, Inc. also represents itself, on its website, as "an integrated, single-source business model."  *Id.*  This representation supports the inference that the relevant "product"  --  LTL shipping services in New York -- is a "Con-Way" product; that is, it is not a product produced and sold solely by Freight, to which Con-Way, Inc. is indifferent.  Furthermore, the complaint alleges that the two entities share a website, that Freight's bills of lading were processed through this website, and that Liverpool's employment documents referred to his employer as "Con-Way."  These allegations suggest that Con-Way, Inc. exercised control and supervision over Freight's publicity, operations, and employment policies.  Simply put, Freight provides LTL shipping services in New York under the "Con-Way" imprimatur.  Thus, Freight's business in New York allows Con-Way, Inc. to bill itself as "an integrated single source business model" and reap the benefits of that distinction.

Accordingly, Freight's activities in New York provide a basis for personal jurisdiction over Con-Way, Inc., because Freight clearly "does all the business" which Con-Way, Inc. "could do were it here by its own officials."  *Frummer*, 19 N.Y.2d at 537.  Defendants fail to cite any cases denying jurisdiction on similar facts.  As discussed above, *Porter*, the only jurisdictional case cited by defendants, addresses the "mere department" theory of *Taca* and not the agency theory of *Frummer*.  Furthermore, in *Porter*, the court found it dispositive that the parent company provided operational services to its subsidiary but charged them a market rate,

observed the formal distinctions between the two entities, did not interfere with the recruitment and assignment of the subsidiary's employees, and did not control the subsidies' policies and operations.  Here, on the other hand, it is reasonable to infer that Con-Way, Inc. oversees Freight's operations (the companies are avowedly "integrated") and supervises its employment policies (because the complaint suggests that standardized employment documents are used by all Con-Way companies).  Similarly, there is no indication that Con-Way, Inc. provides services to Freight at a market rate.  Instead, it profits indirectly from Freight's provision of "Con-Way" shipping services to customers in New York; as Con-Way, Inc.'s website states, Freight is not its customer, but one of its "primary operating companies."  Amended Compl. ¶ 7.  While these allegations may not suffice to establish that Freight or CCX was a "mere department" of Con-Way, Inc., I believe they "give rise to a valid inference of agency" between the two entities, *Delagi* at 431, and defendants offer no argument suggesting otherwise.

B.      *Dismissal Under Rule 12(b)(6) for Failure to State a Claim*

Motions to dismiss pursuant to Rule 12(b)(6) test the legal, not the factual, sufficiency of a complaint.  *See, e.g.*, *Sims v. Artuz*, 230 F.3d 14, 20 (2d Cir. 2000) ("At the Rule 12(b)(6) stage, '[t]he issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims.'" (quoting *Chance v. Armstrong*, 143 F.3d 698, 701 (2d Cir. 1998))).  Accordingly, I must accept the factual allegations in the complaint as true.  *Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007).  However, I do not give effect to "legal conclusions couched as factual allegations."  *Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117, 121 (2d Cir. 2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554-55 (2007)).

While specific facts are generally not necessary to state a claim so long as the statement gives the defendant "'fair notice of what the . . . claim is and the grounds upon which it rests,'" *Erickson*, 127 S. Ct. at 2200 (quoting *Twombly*, 550 U.S. at 555), in at least some circumstances a plaintiff must plead specific facts in order to survive a motion to dismiss. *Twombly*, 550 U.S. at 554-56. The Second Circuit has interpreted this principle as a "flexible 'plausibility standard'" under which a plaintiff must "amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible." *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007) (emphasis omitted) (interpreting *Twombly*).

      1.    *Failure to State a Claim Against Con-Way, Inc.*

My finding of jurisdiction over Con-Way, Inc. does not establish that Liverpool has properly pleaded any claim against that entity. The agency theory described above is a theory of jurisdiction based on *Frummer* and its progeny. It is not a theory of liability, which "can never be predicated solely upon the fact of a parent corporation's ownership . . . of its subsidiary." *Billy v. Consol. Mach. Tool Corp.*, 51 N.Y.2d 152, 163 (1980). To hold Con-Way, Inc. liable for actions taken by CCX/Freight and its employees, Liverpool must allege "direct intervention by the parent in the management of the subsidiary to such an extent that 'the subsidiary's paraphernalia of incorporation, directors and officers' are completely ignored." *Id.* Defendants argue that because Liverpool's complaint lacks such allegations, it fails to state a claim against Con-Way, Inc.

To the extent the complaint seeks to hold Con-Way, Inc. vicariously liable for the actions of its subsidiaries, I agree with the defendants. As discussed above, the complaint states only that the two corporations share a website and that Con-Way refers to itself as an integrated operation. This does not amount to an allegation that Con-Way has operated Freight with

sufficient disregard for its distinct corporate identity.  Indeed, the website expressly acknowledges that Freight and its other subsidiaries are distinct "companies."  Amended Compl. ¶ 7.  Liverpool also alleges that, during the course of his employment, he was "issued various documents pertaining to his employment with the reference 'CON-WAY,'" and that these documents "did not specify whether the reference was to Con-Way, Inc., or Con-Way Freight or Con-Way Express."  Amended Compl. ¶ 22.  But he cites no authority indicating that this fact, if proven, provides sufficient reason to pierce Freight's corporate veil and treat it as an "alter ego" of Con-Way, Inc.

However, vicarious liability is not the only theory of liability suggested by Liverpool's complaint.  As discussed above, with the exception of its statement that Liverpool was "hired" by CCX,[3] the remainder of the complaint does not specify which Con-Way entity (or its employees) took the actions which allegedly render the defendants liable to Liverpool.  *See, e.g.*, Amended Complaint at ¶ 54 ("CON-WAY reported that Liverpool did not pass a drug test"), ¶ 112 ("Subsequent to LIVERPOOL's successful opposition to CON-WAY, CON-WAY began to make false and defamatory reports . . . .").  Thus, by referring to the defendants collectively, the complaint alleges that the defamatory actions were taken by CCX, Freight, or Con-Way, Inc.  And to the extent it properly states a claim against any defendant, it does so against all of the defendants.  Accordingly, defendants' blanket contention that Liverpool has failed to state a claim with respect to Con-Way, Inc. is without merit.

2.  *Contractual Limitations Provision*

---

[3]     Defendants argue that this allegation conclusively establishes that Liverpool fails to state a claim against Con-Way, Inc.  I disagree.  It certainly makes it reasonable to infer that the unlawful actions alleged in the complaint were also taken by CCX employees.  However, because the complaint also suggests that Con-Way, Inc. influenced CCX's employment policies, the fact that Liverpool was hired by CCX does not make it unreasonable to infer that the allegedly defamatory and retaliatory actions were in fact taken by Con-Way, Inc.  The complaint's allegations certainly suggest the possibility that summary judgment in favor of one of these defendants may later become appropriate, but only a motion to dismiss is before me now.

Defendants also argue that Liverpool's claims are barred by a six-month limitations clause contained in a contract executed by Liverpool and Central Express in 2004. The statute of limitations is an affirmative defense, see Fed. R. Civ. P. 8(c)(1), and "a complaint can be dismissed for failure to state a claim pursuant to a Rule 12(b)(6) motion raising an affirmative defense 'if the defense appears on the face of the complaint.'" *Official Committee of the Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 332 F.3d 147, (2d Cir. 2003). In this case, although Liverpool's complaint states that he was "hired" by Central Express, Amended Compl. ¶ 9, it does not mention any contract or suggest its terms. Accordingly, the instant motion is not the proper vehicle for addressing this defense.

3.      *Causes of Action for Defamation*

Under New York law, the elements of defamation are: "(1) a false statement, (2) publication without privilege or authorization to a third party, (3) by at least a negligence standard of fault and (4) the statement either causes special damages or constitutes defamation per se." *Pub. Relations Soc'y of Amer. v. Road Runner High Speed Online*, 700 N.Y.S.2d 847, 849 (2d Dep't 2005).

Defendants assert that Liverpool has failed to state a cause of action for defamation. Their first argument is, apparently, that no false statement was published. Liverpool's complaint states that he was instructed before 8:00 A.M. to report for a drug test and did not appear at the testing site until at least 10:00 A.M. Under federal regulations, an employee has "refused to take a drug test" if he fails to appear for any test "within a reasonable time, as determined by the employer, consistent with applicable DOT agency regulations, after being directed to do so by the employer." 49 C.F.R. § 40.191(a)(1). However, neither the complaint nor defendants' memorandum indicates what constitutes a "reasonable time" under

17

federal regulations or company policy. Furthermore, the complaint alleges that Liverpool could prove that he reported to the testing station thirty minutes after it opened. Given these allegations, I conclude that the complaint plausibly alleges that the defendants made false and unauthorized statements regarding the January 2007 drug test.

Defendants also contend that Liverpool's defamation claims should be dismissed because the defendants are not liable for the republication of injurious statements by third parties. Specifically, they argue that they are not liable for any information received from the USIS database, or information posted to that database by third parties such as Central Transport, Inc. However, a party may be held liable for the repetition of libel or slander if "the repetition was reasonably to be expected." Restatement 2d Torts § 576(c); *see also Karaduman v. Newsday, Inc.*, 51 N.Y.2d 531, 541 n.2 (1980) (endorsing the Restatement's approach in dicta); *Campo v. Paar*, 239 N.Y.S.2d 494, 498 (1st Dep't 1963) ("Anyone giving a statement to a representative of a newspaper authorizing or intending its publication is responsible for any damage caused by the publication."). Here, Liverpool specifically alleges that defendants "had a reasonable expectation that republication was likely, given [their] familiarity with hiring practices in the trucking and transportation industry, and the use of the USIS and DAC databases by trucking and transportation companies in employment decisions." Amended Compl. ¶ 86. In light of this allegation, the fact that Liverpool alleges injury from statements not made by Con-Way does not defeat the legal sufficiency of his defamation claims.

4. *Retaliation Under Labor Law § 215*

Section 215 of New York's Labor Law provides that:

No employer or his agent, or the officer or agent of any corporation, shall discharge, penalize, or in any other manner discriminate against any employee because such employee has made a complaint to his employer, or to the commissioner or his authorized representative, that the employer has violated any

provision of this chapter, or because such employee has caused to be instituted a
proceeding under or related to this chapter, or because such employee has testified
or is about to testify in an investigation or proceeding under this chapter.

N.Y. Lab. Law § 215(1).

Liverpool alleges that he filed for unemployment benefits and prevailed after
Con-Way contested his eligibility. He further contends that Con-Way retaliated against him for
having filed the claim by disseminating false and damaging information about him to prospective
employers. Defendants first argue that to sustain a claim under this statute, "there must be a
nexus between the employee's complaint about the employer's *violation of the Labor Laws* and
the employer's retaliatory action." Def. Mem. Because defendants' allegedly retaliatory actions
were not prompted by any complaint by Liverpool regarding Freight's violation of the labor
laws, but by his successful prosecution of a claim for unemployment benefits, the defendants
contend that Section 215 offers him no relief.

This argument ignores the statute's plain text, which prohibits discrimination on
three distinct bases. It is true that the first "because" clause prohibits discrimination based on an
employee's complaint about his employer's violation of the Labor Laws, but the statute goes on
to state that an employer also shall not discriminate "because such an employee has caused to be
instituted a proceeding under or related to this chapter . . . ." N.Y. Lab. Law § 215(1). The
statute does not define "proceeding," but this term obviously refers to a legal action, *i.e.*, an
action to determine a party's rights according to some body of law. When a worker files a
benefits claim, he tasks the Commissioner of Labor with determining whether he is entitled to
unemployment benefits. N.Y. Lab. Law § 596. Thus, by filing such a claim, Liverpool "causes
to be instituted a proceeding . . . ." *Id.* at § 215(1).

Similarly, the proceeding initiated is plainly "under . . . this chapter." *Id.* The phrase "this chapter" in the retaliation provision refers to the chapter in which that provision appears; namely, Chapter 31 of the Consolidated Laws of New York, known as the "Labor Law." *Id.* at § 1. Chapter 31 also contains, in Article 18 ("unemployment insurance law"), the provisions related to unemployment benefits claims described above. Id. at § 596. Given this plain language, Liverpool, by filing for unemployment benefits, "caused to be instituted a proceeding under this chapter." *Id.* at § 215(1). Accordingly, defendants' first argument is without merit.

Defendants also assert that Liverpool cannot state a claim under Section 215 because "he was not an employee at the time of the alleged tort." Def. Mem. 14. Although defendants fail to develop this argument, it draws some support from the statutory text. The statute forbids an employer from "discriminating against any employee." N.Y. Lab. Law § 215(1). Under the Labor Law, "'Employee' means a mechanic, workingman or laborer *working* for another for hire." *Id.* at §2(5) (emphasis added). "At first blush," the term employee "would seem to refer to those having an *existing* employment relationship with the employer in question." *See Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997) (interpreting Title VII) (emphasis added). If this first impression is correct, as a matter of statutory interpretation, then Section 215 does not prohibit discrimination against former employees and Liverpool's retaliation claim fails.

The parties cite no New York cases squarely addressing this issue, and I have found none. Similarly, I have not found any New York cases discussing, in any related context, whether and when the term "employee" encompasses former employees. However, the Supreme Court addressed this issue in the context of the antiretaliation provision of Title VII of the Civil

Rights Act of 1964 in *Robinson v. Shell Oil Co.*, 519 U.S. 337 (1997). It ultimately concluded that an analogous antiretaliation provision in Title VII was ambiguous, and should be read to encompass former employees to further "a primary purpose of antiretaliation provisions: Maintaining unfettered access to statutory remedial mechanisms." *Id.* at 346. I conclude that the persuasive reasoning of the unanimous Court in *Robinson* suggests an identical result in this case.

The provision at issue in *Robinson* made it unlawful "'for an employer to discriminate against any of his employees . . .' who have either availed themselves of Title VII's protections or assisted others in so doing." *Id.* at 339 (citing 42 U.S.C. § 2000e-3(a)). Although it noted that the term "employees" suggested "an existing employment relationship," *id.* at 341, the Court ultimately concluded that the language was ambiguous for three reasons.

First, the court noted that "there is no temporal qualifier in the statute such as would make plain that [it] protects only persons still employed at the time of the retaliation." *Id.* The same is true here. The Court then observed that the statutory definition of employee ("an individual employed by an employer") "lacks any temporal qualifier and is consistent with either current or past employment." *Id.* at 342. Again, the same is true for this provision. The definition at issue in *Robinson* could mean "an individual *who is* employed by an employer," but it could also mean "an individual *who was* employed by an employer." Similarly, the definition of employee in Section 2(5) could refer to "a laborer *who is* working for another" or "a laborer *who was* working for another for hire." Thus, it is "consistent with either current or past employment." *Robinson*, 519 U.S. at 342.

Finally, the Court observed that

a number of other provisions in Title VII use the term "employees" to mean something more inclusive or different than "current employees." For example, §§

21

706(g)(1) and 717(b) both authorize affirmative remedial action (by a court or EEOC, respectively) "which may include ... reinstatement or hiring of employees." 42 U.S.C. §§ 2000e-5(g)(1) and 2000e-16(b). As petitioner notes, because one does not "reinstat[e]" current employees, that language necessarily refers to former employees. Likewise, one may hire individuals to be employees, but one does not typically hire persons who already are employees.

*Id.*

Similarly, Article 7 of the Labor Law, which includes the antiretaliation provision at issue here, elsewhere uses the term "employee" to encompass something more than a current employee. For example, Section 210-a makes it "unlawful for any employer to refuse to hire . . . an employee in order to evade such employer's legal duty to provide workers' compensation coverage . . . ." As in *Robinson*, this use of "employee" clearly implies a meaning other than "current employee," as "one does not typically hire persons who are already employees." 519 U.S. at 342. Because the analysis in *Robinson* strongly suggests that the relevant language of § 215 is ambiguous, and defendants offer no reason to the contrary, I conclude that the use of the term "employee" in Section 215(1) is ambiguous.

Accordingly, I must resolve that ambiguity. I note that the right-to-sue provision of Section 215(2) provides that "[a]n employee may bring a civil action" against an employer who violates this section. This language strongly suggests that the term employee in this section includes former employees. If it did not, an employee who was discharged for filing a complaint against his employer for a Labor Law violation would not have a right of action under the law. This cannot be the intent of the statutory provision, as a wrongful discharge is the archetypal example of the kind of adverse action retaliation provisions are drafted to prevent. *Murphy v. Am. Home Prod. Corp.*, 58 N.Y.2d 293 302 n.1 (referring to Section 215 as "express statutory protection from firing for engaging in certain protected activities"). Accordingly, I construe Section 215 to prohibit retaliatory discrimination against former employees. Defendants have

offered no reason to believe that a New York court would interpret the provision differently,[4] and there is dicta from the Appellate Division endorsing the reasoning in *Robinson*, which I have followed to the same conclusion here. *Ballen-Stier v. Hahn & Hessen, L.L.P.*, 727 N.Y.S.2d 421, 422 (1st Dep't 2001) (citing Robinson in a case involving retaliation under the New York City Human Rights Law for the proposition that "the term 'employee' as used in the anti-discrimination statutes encompasses former employees).

5.   *Prima Facie Tort*

Liverpool's sixth cause of action sounds in prima facie tort. "The elements of such a cause of action as stated in prior New York cases are (1) intentional infliction of harm, (2) resulting in special damages, (3) without excuse or justification, and (4) by an act or series of acts that would otherwise be lawful." *Burns Jackson Miller Summit & Spitzer v. Lindner*, 59 N.Y.2d 314, 332 (1983). Although the Court of Appeals has questioned the validity of the fourth element, *see id.*, it has never expressly repudiated it, and Liverpool does not dispute that this element is part of a properly pleaded claim of prima facie tort.

Liverpool's complaint alleges that Con-Way's reports regarding the January 2007 drug test "were without any excuse or justification." ¶ 117. This claim is sufficiently amplified by his allegation that those statements were false. However, Liverpool fails to allege that Con-Way's reports were "otherwise lawful." In opposing the motion to dismiss, he notes that the defendants "claim, as set forth in their brief, that the reporting of plaintiff's drug test results would otherwise be lawful under 49 C.F.R. § 40.191(a)(1)." Pl. Mem. 21. But I cannot rely on arguments in defendants' legal memoranda to render the allegations in plaintiff's complaint

---

[4]      Defendants make much of the statement in *Higueros v. N.Y. State Catholic Health Plan, Inc.*, 526 F. Supp. 2d 342, 347 (E.D.N.Y. 2007), that a plaintiff must allege that he suffered retaliation "while employed by the defendant." Even if *Higueros* were binding authority, this language is dicta, as the alleged retaliation in *Higueros* was inflicted on a current employee. Because the *Higueros* opinion offers no reason for the definition of employer it suggests, it is not persuasive on this issue.

plausible, *see Kramer v. Time Warner, Inc.* ("In considering a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), a district court must limit itself to facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference."), and there is nothing in plaintiff's complaint suggesting that Con-Way's reports were otherwise lawful.   Indeed, the thrust of Liverpool's entire complaint is that Con-Way's statements were defamatory and retaliatory.   Thus, if the facts alleged by Liverpool are true, Con-Way's statements were unlawful.   Accordingly, although Liverpool is permitted to plead an alternative theory that would render the defendants liable in prima facie tort but not under theories of defamation or retaliation, *Freihofer v. Hearst Corp.*, 65 N.Y.2d 135, 143 (490 N.Y.S.2d 735 (1985), he has failed to do so.   While it is difficult to imagine a set of circumstances under which Con-Way's conduct would be "otherwise lawful" (*i.e.*, not defamatory or retaliatory) but not justified or excused, defendants do not argue that this cause of action should be dismissed with prejudice, and I therefore not address this issue on the instant motion.

CONCLUSION

For the reasons stated above, the defendants' motion to dismiss for lack of jurisdiction is denied.   Their motion to dismiss under Rule 12(b)(6) is granted with respect to Liverpool's sixth cause of action and denied in all other respects.

So ordered.

John Gleeson, U.S.D.J.

Dated: Brooklyn, New York
       May 15, 2009