UNITED STATES DISTRICT COURT                    ONLINE PUBLICATION ONLY
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
                                                :
MACHEL LIVERPOOL,                               :
                                                :
                                  *Plaintiff*,  :        MEMORANDUM AND ORDER
                                                :
                    - against -                 :        08-CV-4076 (JG)
                                                :
CON-WAY, INC., CON-WAY CENTRAL                  :
EXPRESS and CON-WAY FREIGHT,                    :
                                                :
                                  *Defendants*. :
----------------------------------------------------------------x
A P P E A R A N C E S :

        DEBORAH H. KARPATKIN
                99 Park Avenue
                Suite 1600
                New York, New York 10016
                *Attorney for Plaintiff*

        NOWELL AMOROSO KLEIN BIERMAN, P.A.
                140 Broadway
                New York, New York 10005
        By:     Bradley M. Wilson
                *Attorneys for Defendants*


JOHN GLEESON, United States District Judge:

        Machel Liverpool brings this diversity action against his former employer, Con-

Way Freight ("Con-Way"),[1] pursuant to New York State common law and New York Labor

Law § 215. Liverpool claims that Con-Way made a series of defamatory statements about him

relating to a random drug test to which he was subjected while at Con-Way, and that Con-Way

made these statements in retaliation for Liverpool's application for and ultimate attainment of

---

[1]        On August 27, 2010, I "so ordered" the parties' stipulation of dismissal as to defendants Con-
Way, Inc. and Con-Way Central Express.

unemployment benefits. Con-Way moves for summary judgment, and for the reasons stated below, I deny the motion.

BACKGROUND

A. *Liverpool's Claims*

In March 2004, Liverpool was hired by Con-Way as a dock worker.[2] He began work as a truck driver for Con-Way in June 2004. As a truck driver, he was subject to random drug tests pursuant to company policy and Department of Transportation ("DOT") regulations. When Liverpool was directed to take drug tests, he followed the instructions he received from Con-Way regarding the tests. He received no indication from Con-Way that he ever violated Con-Way rules or policies in reporting for those tests. Liverpool was subjected to one random drug test prior to the test at issue in this action, in November 2005. Neither Liverpool's supervisor nor the notification form for the test stated that Liverpool had to report to the test site immediately. Liverpool Decl. ¶¶ 2, 4, 14-18; Ex. G to Liverpool Opp'n, at 2.

On January 8, 2007, at approximately 7:50 AM, Liverpool arrived at work. He was told by his supervisor, Winston Lawrence, to report for a random drug test and was given a packet containing a drug test notification form. The form did not indicate that Liverpool should report to the test site immediately or that he should return to work after the test, and Liverpool does not recall Lawrence's having given him either of those instructions.[3] Liverpool punched out and, believing that the testing site usually did not open until 9:00 or 9:30 AM and that he therefore "had some time," met up with a woman he knew and had sex. He arrived at the

<hr/>

[2] The facts described here are either undisputed or are set forth in the light most favorable to Liverpool.

[3] Lawrence says otherwise in his certification; he maintains that he told Liverpool to report to the drug test site immediately and report back to work immediately after the test. Ex. 17 to Con-Way Br., at 2. Viewing the facts in the light most favorable to Liverpool, I interpret Liverpool's description of his interaction with Lawrence the morning of January 8, 2007 as a denial that Lawrence instructed him to report to the drug test site immediately and return to work after the test.

testing site at approximately 10:00 or 10:30 AM and was administered the drug test. He did not

return to work on January 8 because he did not believe he was expected to do so, but he worked

as usual on January 9, 10 and 11. Liverpool Decl. ¶¶ 19-25, 27-28; Ex. G to Liverpool Opp'n, at

1.

On January 15, 2007, when Liverpool reported for work, he was directed to meet

with his terminal manager, Jeff Delli Paoli. Delli Paoli asked Liverpool about what he had done

the morning of January 8 and why he did not return to work after the test, and urged him to write

down a statement recounting his actions that day. Unwilling to tell Delli Paoli that he had had

sex on the morning of January 8, Liverpool lied and stated that he went to a Wendy's restaurant

for breakfast before the test. He also truthfully stated that he had encountered road blocks and

traffic on the way to the drug test. Liverpool was informed later that morning in a phone call

with Chris Cline, Con-Way's personnel manager, that Con-Way had discovered that Wendy's

did not serve breakfast, and that Liverpool was being terminated for the Wendy's lie and for poor

attendance, as exhibited by his failure to return to work on January 8. Liverpool Decl. ¶¶ 30-33.

On January 16 and 17, 2007, Liverpool contacted Con-Way and faxed letters to

its human resources department in Ann Arbor, Michigan and the director of human resources at

that office. In those letters, he requested a copy of his employment records and an explanation

for his termination. A week later, he received a copy of his records. *Id.* ¶¶ 40-42; Ex. J to

Liverpool Opp'n, at 1, 2.

Soon thereafter, in late January 2007, Liverpool applied for unemployment

benefits. The New York State Department of Labor ("DOL") determined that Liverpool was

eligible to receive benefits on January 22, 2007. In papers submitted to DOL on February 8,

2007, Con-Way opposed the claim, alleging that Liverpool "was discharged for excessive

absenteeism." On February 21, 2007, DOL notified Con-Way that its allegation was not supported by sufficient evidence and approved Liverpool's claim. Con-Way appealed from this decision, and after a hearing on April 12, 2007, Administrative Law Judge Lynn Morrell of the New York Unemployment Insurance Appeal Board (the "Appeal Board") denied Con-Way's appeal and affirmed the award of benefits to Liverpool on April 16, 2007. Liverpool Decl. ¶ 49; Ex. 12 to Con-Way Br., at 1-3, 7-8.

In February 2007, Liverpool applied for and accepted a job as a truck driver for J.B. Hunt. After learning that the job would require long-distance driving and that his son had just had an asthma attack, Liverpool left the job mid-way through orientation on February 22, 2007. He resumed his search for employment as a truck driver, and applied in October 2007 for a driving job with Bavarian Motor Transport ("Bavarian"), but Bavarian did not offer him employment. He subsequently learned that Con-Way had reported to Bavarian that Liverpool had failed or refused a drug test. Around the same time, Liverpool applied to United Staffing Systems, a placement service, for help in his job search. He later found out that Con-Way had reported to United Staffing Systems that Liverpool had failed or refused a drug test. Liverpool Decl. ¶¶ 44-45, 50-52; Ex. R to Liverpool Opp'n, at 2.[4]

Liverpool also re-applied for a local job with J.B. Hunt in early November 2007. J.B. Hunt's investigator was told by Con-Way that Liverpool did not pass a drug test with them. Liverpool Decl. ¶ 54. Liverpool offered to rebut this claim but was told that J.B. Hunt could not hire him. *Id.* ¶¶ 53-55.

---

[4]     There is minimal record support for the claim that Con-Way made statements to Bavarian and United Staffing Systems in October 2007 that Liverpool had refused a drug test. My understanding that these statements were made is based exclusively upon Liverpool's assertions to that effect in his declaration and his Exhibit R, which appears to be a business record of a screening database used by employers in the trucking industry. *See* Ex. R to Liverpool Opp'n. This document reflects that each of the prospective employers requested that Con-Way provide it with information regarding Liverpool on a certain date, and that Con-Way in fact provided such information to each of them on a subsequent date. The document suggests that the information regarding Liverpool was relayed to each prospective employer through an intermediary, *i.e.*, the database.

On November 5, 2007, Liverpool began working for Central Transport, Inc. ("Central") as a truck driver. One week later, he was told that a hold had been put on his employment. Central terminated Liverpool's employment a few days later. Liverpool requested an explanation, and subsequently received a copy of a report Con-Way had sent to Central stating that Liverpool had refused a drug test on January 8, 2007. Central also reported to the United States Investigations Services ("USIS") database, which provides background information to employers, that it had terminated Liverpool because of Con-Way's report. This information remained available to any prospective employer in the industry for the three years following Central's termination of Liverpool's employment. *Id.* ¶¶ 56-60.

Liverpool next applied for a job with the United States Postal Service ("USPS"). His efforts to obtain employment with USPS were thwarted because Con-Way refused to provide USPS with Liverpool's driving history, claiming that his release was insufficient. Liverpool has been unable to obtain employment as a truck driver in the intervening years leading up to this action. *Id.* ¶¶ 61-62; Ex. R to Liverpool Opp'n, at 4.

B. *Procedural History*

In his December 5, 2008 amended complaint, Liverpool alleges that Con-Way's statements regarding the January 8, 2007 drug test were defamatory, that Con-Way made these statements in retaliation for Liverpool's having prevailed over Con-Way's objection in obtaining unemployment benefits, and that Con-Way's actions render it liable to Liverpool under a theory of prima facie tort. On February 6, 2009, the defendants filed a motion to dismiss, arguing that the Court does not have jurisdiction over Con-Way, Inc. and that Liverpool's complaint fails to state a claim against any of the defendants. After hearing oral argument on the motion on April 17, 2009, I denied the motion insofar as it alleged lack of jurisdiction and failure to state a claim

with regard to Liverpool's first five causes of action, and granted it as to Liverpool's sixth cause of action, *i.e.*, the prima facie tort claim.

Con-Way filed the instant motion for summary judgment on August 27, 2010, claiming that: (1) Liverpool's defamation claims are barred by the statute of limitations; (2) Liverpool has failed to establish the elements of his New York Labor Law § 215 claim; (3) Liverpool has failed to establish the elements of his defamation claims; and (4) Liverpool's claims in any event are barred by the shorter statute of limitations provided for in his employment contract with Con-Way.

## DISCUSSION

A. *Standard of Review*

Summary judgment should be granted when "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). In determining whether a genuine issue of material fact exists, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). After the court has reviewed the record "taken as a whole," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), it should grant summary judgment only if "no rational finder of fact could find in favor of the non-moving party," *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 134 (2d Cir. 2000). "[T]he moving party bears the initial burden of establishing that there are no genuine issues of material fact[;] once such a showing is made, the non-movant must 'set forth specific facts showing that there is a genuine issue for trial.'" *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986) (citing Fed. R. Civ. P. 56(e))). The non-movant "must do

more than simply show that there is some metaphysical doubt as to the material facts,"
*Matsushita*, 475 U.S. at 586; it cannot rely solely on the pleadings, but must produce "significant probative evidence tending to support the complaint," *Anderson*, 477 U.S. at 249 (quotation marks omitted). Entry of summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

B. *Analysis*

1. *Defamation Claims*

a. *Timeliness*

Liverpool asserts four defamation claims against Con-Way based on its statements to employers and prospective employers of Liverpool in October and November 2007. Con-Way's first contention in support of its motion for summary judgment on these claims is that they are time-barred. A defamation cause of action accrues on the date of the first publication of the defamatory statement, *Gelbard v. Bodary*, 706 N.Y.S.2d 801, 802 (4th Dep't 2000), and is subject to a one-year statute of limitations, N.Y. C.P.L.R. 215(3).

Con-Way argues that its first allegedly defamatory statement to a prospective employer of Liverpool regarding his refusal to take a drug test occurred on February 28, 2007 when it reported that information to J.B. Hunt. According to Con-Way, that communication constituted the initial publication of the defamatory writing, Liverpool's defamation cause of action therefore accrued on February 28, 2007, and the applicable limitations period expired on February 28, 2008. Because Liverpool filed his complaint in this action on October 6, 2008, Con-Way contends that his defamation claims are time-barred.

Recognizing that Liverpool alleges the publication of defamatory statements to Bavarian, J.B. Hunt and Central in October and November 2007, and seeking to refute the argument that these statements gave rise to separate, timely causes of action, Con-Way invokes New York's "single publication rule" in an attempt to characterize the latter statements as mere republications of the February 28, 2007 statement to J.B. Hunt.  "[U]nder the 'single publication rule', a reading of libelous material by additional individuals after the original publication date does not change the accrual date for a defamation cause of action but, rather, the accrual date remains the time of the original publication."  *Gelbard*, 706 N.Y.S.2d at 802 (citations omitted); *see also Gregoire v. G.P. Putnam's Sons*, 298 N.Y. 119, 122-26 (1948) (applying the single publication rule to sales of copies of a book containing libelous material, where the copies sold were made from the original "impression" of the book).

Under an important exception to the single publication rule, however, a "reissue[] or republi[cation]" of a defamatory statement is held to "give rise to a new cause of action with a new period of limitations."  *David J. Gold, P.C. v. Berkin*, No. 00 Civ. 7940, 2001 WL 121940, at *3 (S.D.N.Y. Feb. 13, 2001) (citing *Rinaldi v. Viking Penguin, Inc.*, 425 N.Y.S.2d 101, 102 (1st Dep't 1980)); *see also Firth v. State*, 98 N.Y.2d 365, 371 (2002) ("Republication, retriggering the period of limitations, occurs upon a separate aggregate publication from the original, on a different occasion, which is not merely a delayed circulation of the original edition.") (quotation marks and citations omitted).  The Second Restatement of Torts recognizes this "republication" exception, providing that the single publication rule "does not include separate aggregate publications on different occasions," in which "cases the publication reaches a new group and the repetition justifies a new cause of action."  Restatement (Second) of Torts § 577A(3) cmt. d (1977); *see also id.* § 577A(1) cmt. a (stating general rule that "each

communication of the same defamatory matter by the same defamer, whether to a new person or to the same person, is a separate and distinct publication, for which a separate cause of action arises"); *Lehman v. Discovery Commc'ns, Inc.*, 332 F. Supp. 2d 534, 538-39 (E.D.N.Y. 2004) (quoting the Restatement and holding that rebroadcast of defamatory television program "constitutes a republication and therefore provides for a new cause of action and refreshes the statute of limitations"). "The justification for this exception to the single publication rule is that the subsequent publication is intended to and actually reaches a new audience." *Firth*, 98 N.Y.2d at 371 (citations omitted).

The Appellate Division, Second Department recently applied the republication exception in *Ross v. Kohl's Department Stores, Inc.*, 882 N.Y.S.2d 911 (2d Dep't 2009). *Ross* addressed the question of whether the single publication rule applied to a former employer's publication of a defamatory statement regarding the plaintiff to USIS in 2000 and a subsequent report generated by USIS and provided to the plaintiff's employer in 2006. The court held that the rule did not apply, reasoning that "[t]he report generated by USIS in 2006 and provided to the plaintiff's employer was a republication, as it was a separate and distinct publication from the original that was intended to, and actually did, reach a new audience." *Id.* at 911-12 (citation omitted). The court therefore concluded that "the alleged libelous material was republished and the statute of limitations began to run anew from the time of the republication." *Id.* at 912. *Cf. Hoesten v. Best*, 821 N.Y.S.2d 40, 46 (1st Dep't 2006) (finding republication exception inapplicable where defendant's later defamatory statements were made to three people "who were already intimately familiar with the complaints previously levied against plaintiff").

Here, Con-Way's reports to USIS and Liverpool's prospective employers in October and November 2007 were separate and distinct publications from Con-Way's original

statement to J.B. Hunt, and all but one of those statements were made to new audiences. The statement to J.B. Hunt in November 2007 is less clearly a separate and distinct publication in that it was made to the same audience as Con-Way's original statement, but I decline to dispose of this claim on summary judgment in light of the genuine issue of material fact with respect to whether the February 28, 2007 statement to J.B. Hunt was even made.[5]

Con-Way cites to federal cases applying New York's single publication rule for the proposition that multiple transmissions of a defamatory communication constitute a single wrong, *see, e.g.*, *David J. Gold, P.C. v. Berkin*, 2001 WL 121940, at *3-*4 (defamation claim time-barred where defendants originally published a defamatory statement to credit bureaus and thereafter continued to report that statement to the bureaus, and plaintiff brought action more than one year after original publication); *Ferber v. Citicorp Mortg., Inc.*, No. 94 Civ. 3038, 1996 WL 46874, at *6 (S.D.N.Y. Feb. 6, 1996) (same), and contends that its October and November 2007 statements are subsumed under the single statement Con-Way alleges it made on February 28, 2007. Con-Way emphasizes that, as in *Gold* and *Ferber*, the subsequent statements alleged in this case "were qualitatively identical and published by the original libeler." *Gold*, 2001 WL 121940, at *4 (citing *Ferber*, 1996 WL 46874, at *6).

While this latter observation may be accurate, *Gold* and *Ferber* are otherwise distinguishable from this case. The *Gold* court invoked the single publication rule for the proposition that a "*mass transmission* of a defamatory communication constitutes a single wrong," 2001 WL 121940, at *3 (emphasis added), and found that the rule applied to the "continued dissemination of allegedly defamatory statements" to a group of credit bureaus that

---

[5]      Liverpool does not assert a defamation claim based on the February 28, 2007 report to J.B. Hunt. To the contrary, he disputes that Con-Way made such a statement to J.B. Hunt on that date, and on the facts before me I conclude that a reasonable jury could agree with him. As a result, I need not address whether a defamation claim based on the alleged February 28, 2007 statement would be time-barred.

previously had received similar reports from the defendants, *id.* at *4. In *Ferber*, upon which the *Gold* court relied, the court applied the single publication rule to similar facts: the plaintiffs claimed that the defendant continued to report a defamatory statement about them to a group of credit agencies over a period of several months. In justifying its application of the single publication rule, the court found that the plaintiffs had produced no "support for the argument that the continued reporting constitutes a republication of the allegedly defamatory material." *Ferber*, 1996 WL 46874, at *6. Specifically, the plaintiffs had not alleged that the defendant's "continued reporting differed in any way" from the original report to the credit agencies, or that the later reports contained any "modification . . . distinguish[ing] them from those already issued to their intended audience." *Id.* For these reasons, the court found that the defendant's continued reporting was not a republication of the defamatory material, and the single publication rule applied to bar the plaintiffs' claims. *Id.*[6]

Unlike in *Gold* and *Ferber*, Con-Way's actions here were not limited to mere "continued reporting" of its original statement to the same audience. To the contrary, as discussed above, evidence has been presented indicating that most if not all of Con-Way's statements to Liverpool's prospective employers in October and November 2007 were conscious and distinct republications of its alleged February 2007 statement to new and different audiences. Moreover, as the *Gold* and *Ferber* courts recognized, the single publication rule was designed for

---

[6]     A careful examination of the facts of *Gold* and *Ferber* reveals that those courts were on much firmer ground in holding the defamation claims time-barred than I would be here. The plaintiffs in *Gold* filed their complaint more than a year after the last specific defamatory report they attributed to the defendants. In response to a motion for summary judgment, they asserted that a negative report from the defendants still appeared on Gold's credit report within the limitations period. The court readily deemed the plaintiffs' claims time-barred, and only applied the single publication rule after assuming *arguendo* that the defendants continued to report the defamatory statements to credit bureaus within the limitations period. *See Gold*, 2001 WL 121940, at *3 & n.2. Similarly, in *Ferber*, the plaintiffs filed their complaint more than a year after the original publication, but sought to amend their complaint to allege that the defendants continued to report the defamatory statements to the credit bureaus up until seven months after the date of the original report. The court rejected the plaintiffs' argument that the defendants' continued reporting recommenced the statute of limitations, stating that "Plaintiffs cannot resurrect a time-barred claim by contending that the publication continued for seven months." *Ferber*, 1996 WL 46874, at *6.

the context of "mass transmission[s] of a defamatory communication," *e.g.*, "the printing and distribution of a newspaper or magazine to its millions of readers in many jurisdictions." *Gold*, 2001 WL 121940, at *3 (quotation marks omitted); *see also Firth*, 98 N.Y.2d at 370 (noting that the policies impelling the original adoption of the single publication rule arose in the context of communications "contained in traditional mass media").  Con-Way's reports about Liverpool to specific prospective employers in direct response to those employers' requests for such information do not fit this "mass transmissions" model, further undermining Con-Way's argument that the single publication rule is applicable here.

### b. *Elements of Defamation*

Con-Way also contends that Liverpool has failed to establish the first and second elements of defamation and that his defamation claims therefore should be dismissed.  Under New York law, the elements of defamation are: "(1) a false statement, (2) publication without privilege or authorization to a third party, (3) by at least a negligence standard of fault and (4) the statement either causes special damages or constitutes defamation per se." *Pub. Relations Soc'y of Am. v. Road Runner High Speed Online*, 799 N.Y.S.2d 847, 850 (Sup. Ct. 2005) (citation omitted).

### i. *Falsity of the Statements*

I reject Con-Way's contention that there is no genuine issue of material fact as to whether the statements it published regarding Liverpool's refusal of a drug test were false.  Con-Way cannot establish that its statements were true merely by pointing to DOT regulations defining a refusal as a failure to appear for a drug test "within a reasonable time, as determined by the employer, consistent with applicable DOT agency regulations, after being directed to do so by the employer."  49 C.F.R. § 40.191(a)(1).  Given that Con-Way did not accuse Liverpool

of a DOT violation in the documentation regarding his termination, it cannot be said as a matter of law that Con-Way actually believed Liverpool to have refused a drug test.

ii. *Privilege*

A. *Duty of Former Employer*

With regard to the second element, Con-Way argues that it had a qualified privilege as Liverpool's former employer to provide information on drug or alcohol tests to his prospective employers pursuant to DOT regulations. *See Jung Hee Lee Han v. State*, 588 N.Y.S.2d 358, 360 (2d Dep't 1992) (qualified privilege is applicable in defamation cases where "the person making the statements does so fairly in the discharge of a public or private duty in which the person has an interest, and where the statement is made to a person or persons with a corresponding interest or duty"); *see also De Sapio v. Kohlmeyer*, 383 N.Y.S.2d 16, 17 (1st Dep't 1976) ("A qualified privilege exists for the purpose of permitting a prior employer to give a prospective employer honest information as to the character of a former employee even though such information may prove ultimately to be inaccurate . . . .") (citation omitted). Assuming Con-Way has established the requisite duty and interest for invocation of the privilege, there is still a genuine issue of material fact as to whether it acted with actual malice in making the statements regarding Liverpool's alleged refusal of a drug test.

The protection of a qualified privilege is dissolved if the defendant spoke with "malice," which is established upon the plaintiff's showing either that the defendant was motivated by "spite or ill will," *Liberman v. Gelstein*, 80 N.Y.2d 429, 437 (1992) (stating the common law definition of malice), or that the defendant made the statement with "knowledge that the statement was false or with reckless disregard of whether it was false or not," *id.* at 438 (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964)) (quotation marks and

brackets omitted) (stating the federal constitutional definition of "actual malice"). *See id.* at 438

("[W]e have recognized that the constitutional as well as the common-law standard will suffice

to defeat a conditional privilege . . . .") (citations omitted). I have no difficulty concluding that a

rational juror could find either malice standard met in this case.[7] There are several facts that

would support such findings: the contentiousness surrounding Liverpool's application for

unemployment benefits; the timing of Con-Way's reports that Liverpool had "refused" a drug

test, which began only after Liverpool had instituted the benefits proceedings implicating Con-

Way;[8] Con-Way's failure to refer to a DOT violation in Liverpool's termination documentation,

its standard email to management regarding his termination, or its submissions in the benefits

proceedings; and the self-contradictory nature of Con-Way's records of Liverpool's drug test.

Accordingly, I find that there is a genuine issue of material fact as to whether Con-Way acted

solely out of spite or ill will in making its statements about Liverpool's having refused a drug

test, *see Albert v. Loksen*, 239 F.3d 256, 272 (2d Cir. 2001), or alternatively, whether it made

those statements knowing they were false or with a high degree of awareness of their probable

---

[7]    In support of its argument that Liverpool has failed to establish malice on the part of Con-Way, Con-Way places great weight on the fact that Joni Shaver, the human resources employee responsible for issuing the reports of Liverpool's alleged drug test refusal to his prospective employers, did not make the determination that Liverpool's behavior on January 8, 2007 constituted a drug test refusal, did not know that he had initiated unemployment benefits proceedings at the time she issued the reports, and personally had no axe to grind against Liverpool. Ex. 15 to Con-Way Br., at 2; Con-Way Br. at 23. Even assuming the truth of these assertions, a rational juror still could conclude that Shaver's supervisor or another Con-Way employee acted with malice in directing Shaver to issue reports to Liverpool's prospective employers that he had refused a drug test.

[8]    Chris Cline, Joni Shaver's supervisor, testified at his deposition that Shaver was on the January 15, 2007 conference call with him, Liverpool and Jeff Delli Paoli, and that on that call, "we confirmed that it was going to be considered a refusal, I explained that to everybody on the call, so therefore Joni would put that in her database because we're legally obligated under the DOT regs when we get inquiries from other carriers to report that." Ex. 16 to Con-Way Br., at 1. Liverpool denies that he was told in that conversation or at any other time by Cline or Delli Paoli "that Con-Way had determined that I had refused to take a drug test. . . . [or] that my refusal would be reported to other trucking companies if I applied for a job." Liverpool Decl. ¶¶ 34, 35; *see also* Ex. 14 to Con-Way Br., at 4. As a result, viewing the facts in the light most favorable to Liverpool, I cannot conclude as a matter of law that as of January 15, 2007, Con-Way considered Liverpool to have refused a drug test or that it communicated to Liverpool that his conduct would be treated as such.

14

falsity, *see id.*; *Liberman*, 80 N.Y.2d at 438 (quoting *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964)).[9]

## B. *Authorizations To Release Information*

Con-Way asserts that its statements were further privileged as a result of the "releases" of drug testing-related information Liverpool signed in each job application he submitted subsequent to his termination from Con-Way. Such "Drug and Alcohol History Release Authorization[s]," as J.B. Hunt's application termed them, stated that the applicant authorized previous employers to release the date, type of test and result of all drug and alcohol tests he had taken, including the date and type of test for any refusal by him to take a drug or alcohol test, to the prospective employer. *See* Con-Way Br. at 30; *id.* at 31.

Con-Way's invocation of these authorization provisions is to no avail, as they do not authorize the release of false information. In other words, Liverpool did not give up his right to sue his former employer in the event that it lied to a prospective employer about his drug and alcohol testing history. Because Liverpool has presented sufficient evidence to support a rational juror's finding that he established the elements of his defamation claims, the authorizations upon which Con-Way relies are not grounds for dismissing Liverpool's claims.

## C. *DOT Regulations*

Con-Way further argues that its statements to Liverpool's prospective employers were qualifiedly privileged because federal law requires that employers maintain records of their alcohol and drug use prevention programs, that former employers make available such records to an employee's subsequent employers, and that prospective employers request such information

---

[9] Because I conclude that a rational juror could find that Con-Way made the statements at issue with malice, I need not consider Liverpool's alternative contention at oral argument that Con-Way can be held liable for defamation on the ground that "they were reckless in the way they managed their paper." Oral Arg. Tr. at 15, Oct. 8, 2010.

from former employers. *See* 49 C.F.R. §§ 382.401, 382.413 & 40.25. Yet, as Con-Way acknowledges, these federal regulations deny employers protection against defamation actions when they "knowingly furnish false information." *Id.* § 391.23(*l*)(2). As a result, Con-Way's argument regarding the regulations fails for the same reason its "authorizations" argument failed: if Con-Way knew Liverpool had not committed a drug test refusal, but still reported to prospective employers that he had, it would not be insulated from defamation liability under the DOT regulations.

### 2. *Retaliation Claim Under Labor Law § 215*

Liverpool filed a claim for unemployment benefits, was awarded benefits, and, after Con-Way contested the award of benefits on the ground of Liverpool's ineligibility, prevailed on appeal. Liverpool contends that Con-Way retaliated against him for this protected activity in violation of New York Labor Law § 215 by disseminating false and damaging information about him to prospective employers. Con-Way argues that Liverpool cannot establish a causal connection between his protected activity and Con-Way's alleged acts of retaliation because one such retaliatory act occurred prior to the Appeal Board's award of benefits to Liverpool on April 16, 2007.

Section 215 prohibits an employer or his agent from discharging, penalizing, or in any other manner discriminating against any employee "because such employee has caused to be instituted a proceeding under or related to this chapter, or because such employee has testified or is about to testify in an investigation or proceeding under this chapter." N.Y. Lab. Law § 215(1)(a)(ii). Liverpool's filing for unemployment benefits is a proceeding under chapter 31 of the Labor Law, *see id.* § 590, and therefore constitutes protected activity under section 215.

Con-Way makes much of the fact that it first accused Liverpool of refusing a drug test on February 28, 2007, more than a month before the Appeal Board's award of benefits to Liverpool. Specifically, Con-Way asserts that its employee Joni Shaver reported to J.B. Hunt via a faxed document that Liverpool had "refused a required drug or alcohol test." Ex. 11 to Con-Way Br., at 9. According to Con-Way, the fact that this statement preceded the award of benefits defeats any retaliation claim Liverpool might bring based on his having obtained unemployment benefits over Con-Way's objection.

Liverpool disputes whether Con-Way in fact reported the alleged refusal to J.B. Hunt in February 2007. He contests the legitimacy of the document Con-Way has produced reflecting its report of such a refusal to J.B. Hunt on February 28, 2007. In support of his argument that no such report was made, Liverpool points out that (1) Con-Way's February 28, 2007 document was produced with pages missing; (2) a Con-Way document of January 16, 2007 does not indicate that Liverpool had any DOT violations; (3) an October 12, 2007 report from J.B. Hunt to Bavarian states that Liverpool had no DOT drug or alcohol violations during the previous three years; and (4) a DAC Services[10] ("DAC") record reflects that on February 28, 2007, J.B. Hunt reported to DAC that Liverpool had no DOT drug or alcohol violations. Because Liverpool asserts that Con-Way never made the February 28, 2007 statement to J.B. Hunt that he had refused a drug test, he bases his retaliation claims exclusively on Con-Way's statements to other prospective employers in October and November of 2007.

Even if I were to side with Con-Way and conclude as a matter of law that it reported a drug test refusal to J.B. Hunt on February 28, 2007, it would not follow that Liverpool's § 215 claims should be dismissed. While Liverpool does not press this argument in

_____

[10] DAC Services, now known as "DAC Trucking Solutions" and operated by the company "HireRight," is a consumer reporting agency that provides employment history reports and other information about prospective drivers to employers in the trucking industry.

his opposition papers, it is clear that his protected activity began months before the Appeal Board's April 16, 2007 award of benefits. Sometime between his termination and February 8, 2007, Liverpool filed a claim for unemployment benefits with DOL. DOL determined on January 22, 2007 that Liverpool was eligible to receive benefits. On February 8, 2007, Con-Way wrote to DOL opposing the claim, stating that Liverpool "was discharged for excessive absenteeism." On February 15, 2007, Liverpool applied for a job with J.B. Hunt. A few days later, on February 21, 2007, DOL issued its decision granting Liverpool benefits and stating that there was no information in the file undercutting Liverpool's explanation that he believed he was on his own time after completing the drug test on January 8, 2007. On February 26, 2007, J.B. Hunt sent Con-Way a request for information on Liverpool's DOT violations while employed by Con-Way, and two days later, Con-Way sent the contested report to J.B. Hunt disclosing Liverpool's refusal. A rational juror could infer from this sequence of events a causal link between Liverpool's initiation of unemployment benefits proceedings and Con-Way's report of the drug test refusal to J.B. Hunt, irrespective of the date the Appeal Board ultimately affirmed Liverpool's benefits award.[11]

      In addition, as noted above, Liverpool alleges retaliatory acts by Con-Way in October and November of 2007. He claims that Con-Way reported to prospective employer Bavarian on October 26, 2007 that Liverpool had refused a drug test, causing Bavarian to decline to offer Liverpool employment. In early November 2007, Liverpool sought out a local trucking job from J.B. Hunt, but was turned away after Con-Way allegedly reported to a J.B. Hunt investigator that Liverpool did not pass a drug test while employed by Con-Way. Also in early

---

[11] Since Liverpool asserts that the February 28, 2007 statement to J.B. Hunt that he refused a drug test was never made, he has not contended that the statement, if made, constituted retaliation in violation of § 215. At oral argument, his counsel sought permission to assert such a claim at trial in the event that the jury agrees with Con-Way that on February 28, 2007, it told J.B. Hunt that Liverpool had refused a drug test. Con-Way has not persuaded me that it would be unfairly prejudiced by such a claim, so I will permit it at trial.

November 2007, Liverpool applied for and obtained a trucking job with Central after passing a drug test.  Approximately a week after beginning work with Central, Liverpool's employment was put on hold and shortly thereafter he was terminated.  On November 26, 2007, Liverpool requested and received from Central a copy of a report Con-Way had sent to Central stating that Liverpool "had refused a random, post-accident or reasonable suspicion test on January 8, 2007." In addition to terminating Liverpool, Central entered into USIS and/or DAC a report explaining that its termination of Liverpool was due to its receipt of information from Liverpool's former employer that he had committed a drug/alcohol violation while employed by them.

In emphasizing that its February 2007 communication to J.B. Hunt that Liverpool had refused a drug test preceded the April 2007 final award of benefits, and that such an award therefore could not have been the cause for Con-Way's first report of the refusal to J.B. Hunt, Con-Way seeks to immunize itself from liability for any subsequent acts of retaliation against Liverpool.  But even if Con-Way were correct that the only relevant protected activity was Liverpool's ultimate success on his claim for unemployment benefits when the Appeal Board awarded him benefits on April 16, 2007, a rational factfinder could still conclude that the statements Con-Way made to prospective employers of Liverpool in October and November of 2007 were motivated by Liverpool's having prevailed over Con-Way in the unemployment benefits proceedings.[12]

3. *Contractual Limitations Period*

As a catch-all argument, Con-Way contends that pursuant to its conditional offer of employment, which Liverpool accepted and signed on his first day of work for the company,

---

[12]     To the extent Con-Way argues in the alternative that Liverpool should be barred from pursuing his § 215 claim because it is in essence a time-barred defamation claim, I reject this contention as without merit. Liverpool sufficiently has established the elements of a § 215 claim to defeat summary judgment irrespective of the form of retaliation he imputes to Con-Way.

Liverpool was bound to a six-month limitations period for claims relating to his employment with Con-Way.  Because Liverpool filed his complaint in this action more than six months after the occurrence of the last defamatory statement alleged (and far more than six months after his termination), Con-Way argues that all of his claims are time-barred.

New York law permits parties to provide in a written agreement for a shorter limitations period than that prescribed by law.  N.Y. C.P.L.R. 201.  Yet "such agreements are *strictly construed*, and the parties' intention to provide a shorter than usual limitations period must be clear."  *Fireman's Fund Ins. Co. v. Warehouse No. 1, Inc.*, No. 89 Civ. 4069, 1989 U.S. Dist. LEXIS 13507, at *11 (S.D.N.Y. Nov. 14, 1989) (citing *Oil & Gas Ventures – First 1958 Fund, Ltd. v. Kung*, 250 F. Supp. 744, 753 (S.D.N.Y. 1966)) (emphasis added).  Con-Way's conditional offer of employment stated that:

> [b]y accepting this offer, you agree that in the event of any future employment dispute: . . . Not to commence any action or suit relating to your employment with Con-Way more than six (6) months after the occurrence which is the basis of the action or suit or more than six (6) months after the termination of such employment[,] whichever occurs first.

Ex. 1 to Con-Way Br., at 1-2.  The offer also specifies that the employee agrees "[t]o waive any statute of limitation contrary to" the preceding limitations provision.  *Id.* at 2.

Despite Con-Way's contention that this limitations provision bars all of Liverpool's claims, the text of the provision suggests otherwise.  First, it restricts the application of the limitations period to actions or suits "relating to [the employee's] employment."  I reject Con-Way's argument that Liverpool's claims all relate to his employment with Con-Way; to the

contrary, Liverpool's defamation claims involve Con-Way's conduct after Liverpool's

termination, and allege damage to Liverpool in connection with *prospective* employment. If

these defamation claims can be said to relate to any employment, it is Liverpool's employment

subsequent to his termination from Con-Way. Giving the limitations provision a strict

construction, as I must, I conclude that it does not cover Liverpool's defamation claims.

Liverpool's New York Labor Law § 215 retaliation claim comes closer to

"relating to [his] employment with Conway." This claim involves Liverpool's filing for

unemployment benefits as a result of his termination from Con-Way. Nevertheless, I am not

persuaded by the argument that the retaliation claim is barred by the contractual limitations

period. The essence of the retaliation claim is that Con-Way engaged in retaliatory conduct

against Liverpool after his employment at Con-Way, solely because of a post-employment

proceeding he instituted pursuant to his rights under the Labor Law. Again, a strict construction

requires the conclusion that the retaliation claim is too attenuated from Liverpool's former

employment with Con-Way to fall within the limitations provision contained in Con-Way's offer

of employment.[13]

As an additional consideration, the fact that the limitations period prescribed by

the offer of employment could be bounded at the outside by the date that is six months after

termination of employment, as opposed to the date of the occurrence at issue, suggests even

more forcefully that the provision should not be read to apply to Liverpool's post-termination

---

[13]      Con-Way's expansive interpretation of the limitations provision is further undermined by the
provision's first paragraph. That paragraph provides for a conciliation mechanism much like the Equal Employment
Opportunity Commission ("EEOC") administrative process mandated for Title VII and New York Human Rights
Law discrimination or retaliation claims. Specifically, it requires an employee to put Con-Way's president on notice
of the particulars of his claim 60 days before instituting an action against Con-Way. As Con-Way's counsel
confirmed at oral argument, that requirement affords the company an opportunity to respond to the employee's
concerns and reach a solution outside of litigation. It would be odd indeed to construe the limitations period as
applying to claims brought after an employee's termination based on an employer's post-termination conduct; it
strains credulity to suggest that the parties expected an employee in that situation to contact his former employer's
management about his claim in an effort to reconcile.

claims. It would be absurd to interpret the provision as having been intended to allow Con-Way to fire an employee, wait six months and a day, defame the now ex-employee, and escape liability entirely for the defamation and/or retaliation solely because the contractual limitations period had expired.

Because I am unpersuaded that the text of the limitations provision can be read to apply to claims like Liverpool's, I find that his claims are not time-barred under that provision.[14]

CONCLUSION

For the foregoing reasons, Con-Way's motion for summary judgment is denied.

So ordered.

John Gleeson, U.S.D.J.

Date:   November 18, 2010
        Brooklyn, New York

---

[14]     Because I dispose of Con-Way's argument regarding the contractual limitations provision on textual grounds, I need not address Liverpool's claims that his employment contract with Con-Way was unenforceable on grounds of unconscionability or vagueness.